The next case before us this morning is United States v. Wiggins, 25-6013. Counsel for appellant, if you would make your appearance and proceed, please. May it please the court. My name is Howard Pincus from the Federal Public Defender, and I represent Ronnie Wiggins. The government agrees that Mr. Wiggins is not an armed career criminal and that he is entitled to sentencing relief. He is also entitled to relief from his conviction. Reasonable suspicion of drunk driving was dispelled by Officer Robertson's interaction with Mr. Wiggins, which was confirmed by a test he administered just to be sure. At that point, there was no basis to continue to detain Mr. Wiggins. The evidence later obtained from his SUV included the gun on which this felon in possession prosecution was based, should therefore have been suppressed. At the outset, in preparing for oral argument, I noted that the calls to the 911 operator were introduced at trial, though they are not in the record on appeal. Leaving aside the government's waiver of any argument for affirmance on the alternative ground, that there was reasonable suspicion of reckless driving that was not dispelled, those calls could not be considered. Under footnote 2 of this court's decision in the United States v. Brown, which is at 496 F3rd 1070, for the 911 calls to have been considered, there would need to be at least proof of what was reported to the 911 operator that made its way to dispatch. The proof is completely lacking here, and there is certainly not the indisputable proof that is needed in the context of a request to affirm on an alternative ground. As for reasonable suspicion of drunk driving, as Officer Robertson explained, he pretty quickly figured out that Mr. Wiggins was not intoxicated, and he confirmed this with a field sobriety test. And you're talking about the HGN test? I am, yes. And by the time that, right before he did that, right, he had made, he had put in for dispatch to get information about the status of whether there were any warrants out for Mr. Wiggins, right? He had done that while before the HGN test, yes, Your Honor. Okay. And it seems to me that's a distinction with a difference, is it not? Because he was doing, conducting the matters that were part of the purpose of the stop. And part of that was, as Rodriguez itself indicates, part and parcel of that is checking to see if there are warrants. And so he put in that call, and when it came back as possible warrants, why did that not take on a life of its own? Because he continued the detention after the point at which the reasonable suspicion was dispelled. And at that point, the mission of the stop was completed. But was that the full mission of the stop when Rodriguez speaks about part of the mission of the stop being to check for warrants? And if he had made the call to check for warrants, he had contacted dispatch, was he supposed to call dispatch back and say, no, no, no, don't give me the information that you found, because I've done an HGN test on him and he doesn't seem to be drunk? Is that what was supposed to happen? No, what he's supposed to do is release Mr. Wiggins, let him go on his way. What Rodriguez also says is that a warrant check is permissible to allow the officer to complete his mission safely, the traffic mission safely, and the mission was completed once reasonable suspicion of any violation was dispelled. At that point, the traffic stop should have ended. And that's the problem here is that, I mean, the easiest thing for the officer to do was just to hand Mr. Wiggins back his license and let him go on his way. He had already completed the mission, and the warrants check on officer's safety grounds is designed to allow him to complete that mission safely. The mission was over once the basis for the stop was dispelled. Counsel, don't we have cases that say the purpose of a warrant check is not just officer safety? And because those additional purposes, such as, you know, just good governance and ensuring people don't have warrants who are out and about on the streets, I think we have one case that's discussed that. So don't those other purposes also come to play here? Because I hear you saying, well, the safety mission was over once the investigation of drunk driving had concurred. No, those reasons do not allow for the continued detention here. As the court explained in Rodriguez, inquiries in the interest of traffic safety are allowed as incident to a traffic stop and to determine whether an apparent traffic violator is wanted for other traffic offenses. Here, the traffic stop was over. So there was nothing that the warrants check for traffic purposes could be incident to. Well, just your statement of the rule. He was not an apparent traffic violator. He was not a traffic violator. Just your statement of the rule suggests to the contrary, apparent traffic violator. And so it is incident to determining whether he's an apparent traffic violator. Well, you're going through the process of determining whether that's true. No, the apparent traffic violator refers to the stop. And the reasonable suspicion here was dispelled. At that point, he's not an apparent traffic violator. He's somebody who was mistakenly stopped when there may have been reasonable suspicion of drunk driving. But that investigation revealed he was not driving while intoxicated. And at that point, he was not an apparent traffic violator, and he should have been allowed to leave. Just as the court doesn't allow stops to check for traffic safety under Delaware v. Pruce, once it's determined that he's not an apparent traffic violator, there is no basis for checking to make sure that he's operating the vehicle safely. Well, alluding to Judge Federico's comments, we have a bunch of cases where there is, and I'm not going to take the time to fish out the exact name right now, but at least my recollection, and tell me if I'm wrong, is that we have a bunch of cases where there are people driving on the roads, where, you know, most of these are highway traffic stop cases, where you get the ID of the individual, whatever caused you to have reasonable suspicion to pull them over to begin with. You get the ID of that person, and we have held that there's a certain amount of allowance for you to go through this dispatch process, check the ID, check for warrants, do all of those things, and then hand them their license back and let them go. A lot of these cases turn on the question of whether you did that too long, whether you held them too long, whether you didn't give him his ID back, all that kind of stuff. But the basic premise that when you would conduct a traffic stop, let's say for the tag was off or something, you conduct a traffic stop, you have the officer, law enforcement officer, can go through this process that Jeff Federico alluded to of just checking for warrants. Certainly can if reasonable suspicion is not dispelled. If there's an ongoing, if there's, it's a traffic violation that gives the right to do these checks. Once it's dispelled, the basis for the checks doesn't exist anymore. So all of those cases are where the detention is still lawful because reasonable suspicion has not been dispelled. That's the difference in this case. Can you help me understand your argument that the traffic violation investigation was dispelled? The call wasn't, well, I guess maybe this refers back to your first point about the 911 calls. But as I understand it, the calls were made that there's a vehicle driving erratically. So you don't contest that the initial stop was to investigate why that vehicle was driving erratically. Why do we need to categorize it so cleanly as only an investigation into potential drunk driving as compared to just general reckless driving? Well, the call notes on which the stop was based do not reflect that driving erratically, weaving in their lane. And the district court determined that the stop, as the officers testified to, was for the purpose of investigating drunk driving. The district court didn't make an alternative finding on reasonable suspicion of reckless driving. And the government has not, in this appeal, effectively made such an argument. All they do is say driving erratically, therefore reckless driving. They don't try to link it to the Oklahoma statute. And driving within a lane is not reflective of driving carelessly or wantonly without regard to the safety of persons or property, which is how Oklahoma defines reckless driving. So there really is no basis here for this court to determine that there was another basis of reasonable suspicion that was not dispelled. So when the officers agreed that, when Officer Robertson agreed that Mr. Wiggins was not intoxicated, that's when the stop should have ended. Counsel, the paradigm you're constructing here is that, again, once reasonable suspicion is dispelled, then they can take no additional action because they can't extend the stop. But what about a case where the violation under investigation is speeding, and an officer observes it by use of a radar gun, knows the speed is in excess of the limit, and stops someone? There are cases where that happens, and then an officer quickly determines they're not going to write a ticket. They're just going to give them a verbal warning. But then they continue to carry on with the other administration purposes of the stops, checking for a valid license and registration, checking for warrants. Under your paradigm, though, none of that would be permitted because the investigation, the reasonable suspicion is dispelled. The officer knows the speeding occurred. Well, the reasonable suspicion is not dispelled in that situation. There is a traffic violation. And the traffic violation is what allows for the continued detention, regardless of what action, what enforcement action the officer will ultimately decide to take. There is still a continued basis for the detention. There isn't when reasonable suspicion has been dispelled. What's the basis in that case that doesn't apply in this case? It's the speeding. We know that the motorist was speeding. And if he was speeding, they can do all of these other things, like check to make sure he's now not an apparent traffic violator, he's a traffic violator, to see whether he's otherwise can safely operate the vehicle and do a safety check for that reason. That's missing when there is no basis any longer for reasonable suspicion of any traffic violation. Well, for a moment, let's focus on the inevitable discovery argument. And even if after the HGN test there was a dispelling of the notion that he was a violator, why wouldn't it be inevitable that they would have, in fact, stopped him, either required him to stay there or pulled him out of the drive-through lane and held him, when mere moments after that they got the hit back that there was a possible warrant? And specifically, what I'd like you to respond to is the White case, which seemed to have a number of historical facts that many more than actually were present here, I mean, I'm sorry, the reverse of that, at least as many facts in White as there are here, to suggest that there would have been inevitable discovery. Well, I don't have the White case firmly in mind, but I can say There was a case cited in the briefs, though. Well, I can say that the, I mean, I'm thinking of Nix v. Williams, but what we have, what has to be shown is as a matter of historical fact what the police would have done. And we don't know what the police would have done because nobody testified to that. They didn't testify they would have kept tabs on Mr. Wiggins. They didn't testify whether they would have gone on to other duties. They didn't testify to whether they would have acted based on the initial report of a warrant, which had to be confirmed before they could take action. Well, they did act. They did act based upon the initial determination of whether there was a warrant, in which they continued to engage in a conversation with him. So they did act. Well, but they continued to unlawfully detain him. If they had let him go and if he had left McDonald's, we don't know what they would have done because they never testified to it. Well, if you look, one of the reasons the White case is significant is the court engages a lot of inferences as to what the government would have done based upon things that it did do. Like it did check the records of the individuals who were at this event. And it was in a room. They go into the room. The defendant has a gun. They check the records of the people who were in the room. And so the court would say, well, the court, our court said, well, they would have checked Mr. White's records anyway, and they would have found they would have gotten a hit. Well, in this situation, they had already called it in. Okay. So they already called it in. You've got this moment in time where we take your argument. The reasonable suspicion is suspended. Surely they would have gone after him, and there's a reasonable basis to believe, because of what they did do. What they did do is they immediately followed up and said, well, you hold on and wait until we determine what the ultimate outcome is. That was on the basis of thinking they could detain him, which was wrong. No, no, no, no, no. Why is that on that basis? If what we're looking at is what they did do once they found out that there was a possible hit, it was predicated on the possible hit. But we don't know what they would have done if he had departed the McDonald's, because they never testified to that. There are no demonstrated historical facts about that. They had unlawfully detained him, and that's the context in which they kept him there. They thought they could keep him there, wrongly, unreasonably, and that's why there's also why Utah v. Strife is also inapplicable here. And we would ask the court not only to ‑‑ we would ask the court to vacate Mr. Wiggins' conviction and order the evidence suppressed. At a minimum, it should vacate a sentence and remand for resentencing without consideration of the Armed Career Criminal Act. Thank you. May it please the court, Daniel Gridley for the United States. This court should affirm the district court ruling denying Mr. Wiggins' motion to suppress, and the court may affirm the decision of the district court on any of three solid legal grounds, the attenuation doctrine, inevitable discovery, as well as simply a finding that the detention of Mr. Wiggins was not unlawfully extended. On October 30th, 2022, shortly after midnight, two different citizens observed Mr. Wiggins, the appellant's erratic driving. Each of those individuals felt compelled to use the 911 call system to summons emergency assistance. According to 911 calls, the citizens described Mr. Wiggins' driving as all over the place on the road and very erratic, and another caller described that he almost went off the side of the road. They conveyed information about his location so police could intervene in this situation that they apparently deemed an emergency, and Officer Robertson did just that. It is my understanding of the law that under United States v. Smith, 527 F. 2nd at 694, that this court can take into consideration facts that were introduced at trial. Both of the redacted 911 calls were submitted during the jury trial in this matter. As we assess the reasonable suspicion in this matter, it's important for us to keep in mind that the level of suspicion required for investigatory detention is considerably less than proof beyond a preponderance of the evidence. Furthermore, it's not even necessary that the government have evidence linking the suspect to a particular criminal offense. Once the HGN test came back negative, what basis was it for them to hold him? Your Honor, we would submit that there was still reasonable suspicion of criminal activity, generally speaking. And what general activity of reasonable suspicion of general criminal activity was there? Reports from the 911 system that Mr. Wiggins was driving erratically all over the road, I would submit that that is one. Reasonable suspicion of reckless driving could be other things, Your Honor, but certainly reasonable suspicion of criminal activity overall. We heard the defense today say that what went on here in terms of the factual basis does not correlate with Oklahoma's reckless driving statute. Do you disagree with that? I do disagree with that, Your Honor. I'd submit that when someone reports that someone is calling to 911, reporting that they are all over the place on the road and very erratic, and that two different people have felt the need to use 911, that the common sense implication there is that this rises to a level of an emergency. In other words, we need immediate law enforcement attention to this matter, or else it's going to pose a risk to the public. I would submit a logical inference here. But the Oklahoma statute would govern and provide the basis for a criminal offense based upon what the officers knew at the time, reasonable suspicion of a criminal offense? That's different than this talk about an emergency. I'm asking the specific question related to the Oklahoma statute for reckless driving. I'm sorry. Could you restate the question?  I'm talking about the specific statute that relates to reckless driving in Oklahoma. How does that correlate with the conduct of the defendant that was reported in this case? And would the officers, therefore, have had a reasonable suspicion that he violated that statute? I would, Your Honor. When we look at the specific statute, 47OS11901A, it talks about reckless driving a motor vehicle in a careless or wanton manner without regard to the safety of persons or property or in violation of, and then it goes on to talk about the speeding. I would submit that the evidence put out on the 911 call is synonymous with that type of driving behavior and that certainly it rises to the level of reasonable suspicion. But, again, I would also reiterate that it's not a requirement that the officer be able to link to any particular criminal offense. It's a general criminal offense overall that must be used to assess. As the court has also reiterated, once the officer has detained him and initiated the process of a traffic stop, there's certain things that go as part of that, go hand in hand with that, as part of the basic mission of the stop. And it's undisputed that when they initially contacted him, there was a valid basis for this stop. And officers, as I think the court is aware, go by standard procedures. And Officer Robinson testified in the suppression hearing that he was following standard procedures. One of his standard procedures is to run a warrant check on every driver that he stops. And in this case, he did that. When in relation to the horizontal gaze nystagmus test being administered? He obtained Mr. Wiggins' identification 50 seconds into the video. That was not full 50 seconds into the stop. He called that in a minute and 55 seconds into the video. And he performed the HGN test at 3.17 into the video. And so then after that, he starts to lecture or warn Mr. Wiggins about his driving behavior, which I would submit he's within his lawful right to do based on the information that he has at the time. Whether he intends to give him any type of warning or arrest, I'd submit that's irrelevant here. And so he's engaged in the normal process of a stop. And this court, the Supreme Court in Ramirez and this court in Mayville, Ramdial, and specifically in Dawson has talked about the fact that even when an officer has completed everything that is related to the initial traffic infraction that he's pulled this individual over, it's not over until he's completed all the other tasks tied to the mission of the stop. In the Dawson case specifically, the officer had written the citation, was absolutely done with that process, and he waited and he kept the driver there for the purpose of obtaining a rental agreement, which the driver had trouble finding. And so the court found in Dawson that's fine because that is a task that is closely linked to the mission of the stop. We would argue that just like in Dawson where the rental agreement issue is closely tied to the stop, here the warrant check, which was initiated early on in the process, is closely tied to the stop. And so the mission is not complete until the warrant check is complete. I would also, going on to inevitable discovery, defense claims that the government did not put forth sufficient information or evidence as to the issue of inevitable discovery, I would submit that the video itself that was presented gave an immense amount of information on that issue and what the situation played out and what the officers would have done, as the court mentioned, in the White case. The video tells us that, one, that this was a very busy drive-through line at McDonald's. If you look closely at the video, you can also see that Mr. Wiggins has passed the station where he would have put in his order. And so he's got an order in and he's into the part of the line where he's simply waiting to pick up his order. And so logic would stand to reason, I think he indicated he placed an order for a hamburger, he's hungry. Logic would stand to reason that he's going to wait that out and he's not going to divert out of the line necessarily. After he's been stopped by the police, maybe he doesn't have an appetite anymore. I don't know whether that logic would necessarily dictate that. Was there any testimony at all about what the officers would have done? I don't know that there was the explicit question, what would you have done had you released him and then gotten the hit back? But as the court has pointed out, we know what he would have done because we see exactly what he did when he received word that this individual had a possible warrant. And furthermore on that issue with regard to the inevitable discovery doctrine, that was a factual finding that was made by the court. And that was a factual determination which implicates the clear error standard I would submit. And I just don't believe that there's been any information, evidence that's been put before the court that that was a clear error for the court to draw that conclusion. And then again, Your Honor, we get to the issue of the attenuation doctrine. When we look at the attenuation doctrine, it's undisputed that the first element set out by Utah v. Strieff, the short proximity here cuts against the government. The second factor, intervening circumstances, cuts in favor of the government. The only disputed issue based on the briefing is the third and final factor, which is purpose and flagrancy of official misconduct. Just like in Utah v. Strieff, the officer in question held an individual. In that case, it was without reasonable suspicion at all to even initiate the detention, held on and ran him for warrants check. And the court determined that under the circumstances, that did not rise to the level of the type of purpose and flagrant official misconduct that would cut against the government. And this court in Ramos reiterated and said a little more meat on the bones as far as what those type of requirements are for the purpose and flagrancy of official misconduct. One, it must be obvious that the, to the officer, excuse me. One, it must, the impropriety of the official misconduct was obvious. The official knew and at the time that his conduct was likely unconstitutional, but engaged in it nevertheless. And two, that the misconduct was investigatory in design, purpose, and executed in the hope that something might turn up. It's clear from the record in this case, and in fact, Officer Robinson testified, he was simply following his standard operating procedure in obtaining a warrant check on Mr. Wiggins. And so, I would again submit that this court has three viable options to affirm the decision of the district court denying the motion to suppress. Simply put, the detention was not unlawfully extended because the Officer Robinson was engaged still in the part of the mission of the stop. Two, the inevitable discovery doctrine applies as well. There is no information of a clear error made by the district court as to that finding. And finally, the attenuation doctrine also applies. If there are no other questions from the court, I would simply ask that the court affirm the ruling of the district court. Thank you. Thank you, Counsel. Case is submitted. Thank you for your fine arguments.